NELSON *v.* HAYWOOD COUNTY.

(*Jackson.* July 7, 1892.)

1. CONSTITUTIONAL LAW. *Passage of statutes. Presumption of regularity.*

The Courts indulge every fair and reasonable presumption in favor of the regular and valid passage of statutes. This rule finds application in the construction of journal entries, and in aiding their defects or supplying their omission. This rule is subject to the limitation that no presumption will be indulged which necessarily contradicts the affirmative showing of the journals. (*Post, pp. 603, 604.*)

Cases cited and approved: Brewer *v.* Huntingdon, 86 Tenn., 732; State *v.* Algood, 87 Tenn., 163; Williams *v.* State, 6 Lea, 549; State *v.* McConnell, 3 Lea, 332.

2. SAME. *Same. Description of Act in journal entries.*

It is not essential to the validity of a statute that it should be described in the journal entries recording its passage by setting out its title *in ipsissimis verbis.* Discrepancies between such journal entries and the title of Act are treated as mere abbreviations or omissions, which are supplied by presumption or disregarded as immaterial. (*Post, pp. 604–606.*)

Constitution construed: Art. II., Secs. 17, 18, 21 (1834).

Case cited and approved: 143 U. S., 649.

3. SAME. *Same. Same.*

A discrepancy between the Act as passed and the journal entries recording its passage, as to the number of sections contained in the Act, does not affect its validity. This is not a material matter, but, if it were, the Act and not the recital of the journal entries would be conclusively presumed to speak the truth. (*Post, pp. 606, 607.*)

Constitution construed: Art. II., Secs. 17, 18, 21 (1834).

4. SAME. *Same. Construction of report of conference committee.*

A bill having been passed regularly by both houses was referred, upon a difference between the two houses as to certain proposed amend-

ments, to a joint committee of conference. This committee reported as follows: "Your committee of conference, to whom was referred Senate Bill No. 10, with House amendments, beg leave to report the accompanying bill in lieu of said bill and amendments, in which is embraced substantially all the provisions of both houses. Your committee deem it prudent to propose a bill in lieu, as the original bill has been much disfigured by amendments, interlineations, and erasures. Your committee ask that the bill offered be accepted and passed." This redrafted bill of the committee of conference contained fewer sections and omitted some of the proposed amendments—the committee substituting compromise provisions therefor. The committee's report was concurred in by the houses, and the bill signed. The bill was not passed after its redrafting by the committee.

*Held:* The Act was constitutionally passed, and is a valid law. The committee did not report a new bill. They had authority to make such changes as would reconcile differences between the two houses. It was not necessary that the bill should be passed upon three readings after the committee's report. (*Post, pp. 602, 603, 607–609, and 611–612.*)

5. SAME. *Same. When statute takes effect.*

When a bill is signed by the Speakers of the two houses, it then takes effect by relation as of date of its passage. It is not required that a bill shall be enrolled before its signing, and therefore the recital of the date of its enrollment on the journals affords no evidence that the bill had not been signed at that date. (*Post, pp. 609–611.*)

Constitution construed: Art. II., Secs. 17, 18, 21 (1834).

Case cited and approved: Dyer *v.* State, Meigs, 237.

---

### FROM HAYWOOD.

---

Appeal in error from Circuit Court of Haywood County. W. H. SWIGGART, J.

J. R. FLIPPIN, W. W. RUTLEDGE, and TURLEY & WRIGHT for Nelson.

J. W. E. Moore, A. D. Bright, and Metcalf & Walker for Haywood County.

L. Lehman, Sp. J.  This cause, which was commenced by a petition for a *mandamus* to require the Justices of the County Court of Haywood County to levy a tax to pay coupons upon bonds issued under the provisions of Chapter 55 of the Acts of the General Assembly of 1869–70, was before this Court on a former appeal of the relator from the action of the Circuit Court of Haywood County, in sustaining various assignments of demurrer to and dismissing the petition.

This Court at the April Term, 1889, reversed such action of the Circuit Court, overruled the demurrer, and remanded the cause for further proceedings.

The opinion of the Court on that appeal is reported in 3 Pickle, 781, and recites so fully the allegations of the petition for *mandamus*, and the grounds of demurrer interposed *in limine*, that it would be mere repetition to state them now, and we content ourselves by referring to that opinion for such allegations and assignments of demurrer.

When the cause was resumed in the Circuit Court the respondents answered, and among other things in their answer, as far as it is necessary to consider the defenses made thereby, because of what was settled by the former decision of this Court, set up that the Act of 1869–70, Ch. 55,

was not legally or constitutionally passed by the General Assembly.

As appears from the bill of exceptions taken by the relator, the Circuit Court on this ground denied the peremptory writ of mandamus and dismissed the petition, and the cause is here again on the appeal of the relator.

The sole assignment of error to be considered on the present appeal involves the inquiry whether the Act of the Legislature under which the bonds, of some of which the coupons in question represent the interest for certain periods of time, was passed by the Legislature in conformity to constitutional requirements.

That Act was passed, or purported to have been passed, on February 8, 1870, at which time our Constitution of 1834 was in force, and under the provisions of which its validity must therefore be tested.

The parts of the Constitution of 1834, as far as applicable to the objections made to said Act, were contained in Sections 17, 18, and 21 of Article II. thereof, which are as follows:

"SEC. 17. Bills may originate in either house, but may be amended, altered, or rejected by the other.

"SEC. 18. Every bill shall be read once on three different days, and be passed each time in the house where it originated, before transmission to the other. No bill shall become a law until it shall be read and passed on three days in each house, and be signed by the respective Speakers.

"SEC. 21. Each house shall keep a journal of its proceedings, and publish it, except such parts as the welfare of the State may require to be kept secret."

Chapter 55 of the Acts of 1869–70, as published among the Acts of that session, is entitled "An Act to confer upon the town of Brownsville, in the county of Haywood, the authority to issue corporation bonds in aid of railroads, and for other purposes," and, as published, consists of twenty-two sections, is signed by the Speaker of each house, and is recited to have been "passed February 8, 1870." The Act appears to have originated in what was styled "Senate Bill No. 10," concerning which entries are contained in the Senate and House Journals as follows:

"Senate Bill No. 10, To confer upon the town of Brownsville authority to issue corporation bonds. Passed first reading, and was referred to the Committee on Internal Improvements." October 8, 1869, Senate Journal, p. 21.

On Thursday, October 28, 1869, the Committee on Internal Improvements reported, recommending the passage of the bill. Senate Journal, p. 81.

On the same day the bill passed its second reading, and is then styled, "Senate Bill No. 10, To confer upon the town of Brownsville authority to issue corporation bonds in aid of railroads." Senate Journal, p. 85.

On November 1, 1869, Senate Bill No. 10, then styled, "To confer authority upon the town of

Brownsville to issue bonds," passed third reading. Senate Journal, p. 89.

On November 10, 1869, Senate Bill No. 10 passed first reading in the House. House Journal, p. 181.

On January 28, 1870, Senate Bill No. 10 "was taken up and passed its second reading, and made the special order for 10:30 o'clock to-morrow." House Journal, p. 562.

On January 29, 1870, Senate Bill No. 10 "was taken up. Mr. Thomas offered the following amendments: In first section strike out 'semi-annually' and insert 'annually,' and strike out 'six per cent.' and insert 'eight per cent.,' * * * which was adopted, and the bill, as amended, passed its third reading." House Journal, p. 565.

In the Senate, January 31, 1870, a message was received from the House, returning Senate Bill No. 10 amended and passed; whereupon the amendments were read and referred to the Committee on Internal Improvements. Senate Journal, pp. 346, 347.

On February 1, 1870, the Committee on Internal Improvements, to whom was referred amendments to Senate Bill No. 10, recommended " a concurrence on the amendments of the House, which constitute the twenty-sixth section, and a non-concurrence in all of the other House amendments." Senate Journal, p. 351.

On the same day, "House amendments to Senate Bill No. 10, To authorize the town of Brownsville

to issue corporation bonds," were non-concurred in, except the amendment which constitutes the twenty-sixth section of the bill, which was concurred in. Senate Journal, pp. 352, 353.

On February 1, 1870, a report was received in the House, from the Clerk of the Senate, as follows: "I am directed to return Senate Bill No. 10, 'To authorize the town of Brownsville to issue corporation bonds,' the House amendments non-concurred in, except the twenty-sixth section, as amended." House Journal, p. 590.

On February 2, 1870, the House insisting upon its amendments, the Senate adhered to its non-concurrence, and asked for a committee of conference. Senate Journal, p. 373.

On February 4, 1870, in the House, Senate Bill No. 10 was taken up, after notification that the Senate requested a committee of conference, and the House appointed a committee of conference on its part. House Journal, pp. 630, 631, and 632.

On Saturday, February 5, 1870, a report from the conference committee was received in the Senate, as follows: "Your committee of conference, to whom was referred Senate Bill No. 10, with House amendments, beg leave to report the accompanying bill in lieu of said bill and amendments, in which is embraced substantially all the provisions of both Houses. Your committee deem it prudent to propose a bill in lieu, as the original had been much disfigured by amendments, inter-

lineations, and erasures. Your committee ask that the bill be accepted and passed." On motion, the report of the committee was concurred in, and it was ordered that the bill, with the report, be immediately transmitted to the House. Senate Journal, p. 375.

On February 7, 1870, in the House, Senate Bill No. 10, with the report of the Committee of Conference, was taken up and the report concurred in. House Journal, pp. 645, 646.

On February 18, 1870, the Committee on Enrolled Bills reported to the Senate that they "have examined Senate Bill No. 10, and find it correctly enrolled." Senate Journal, p. 416.

On February 21, 1870, a message was received by the Senate from the House, returning Senate Bill No. 10, signed. Senate Journal, p. 424.

The insistence of the defendants is, that the Act of February 8, 1870, was a new bill, different and distinct from Senate Bill No. 10, and, as such, was not read in each of the houses of the General Assembly, as required by the Constitution. The construction placed on the constitutional provisions in relation to the steps to be taken by the Legislature in enacting bills, under the decisions of this Court, is to the effect that, while the journals will be considered in determining the validity of an Act of the Legislature, every reasonable inference and presumption will be drawn and indulged in favor of the regularity of its passage, " and where it did not affirmatively appear not to

have passed, and such legitimate construction could be given to the record as sustained the law, it would be done." *Brewer* v. *Mayor, etc., of Huntingdon,* 2 Pickle, 732.

In *State* v. *Algood,* 3 Pick., 163, the rule is thus expressed: "We think the rule is well settled that where the journal does not affirmatively show the defeat of the bill, every reasonable inference and presumption will be indulged in favor of the regularity of the passage of an act subsequently signed in open session by the Speakers." *Williams* v. *State,* 6 Lea, 549; *State* v. *McConnell,* 3 Lea, 328.

Keeping this rule in view, we proceed to consider the grounds upon which the Act of February 8, 1870, is assailed:

*First.*—It is assumed that the title of the Act was different from that of Senate Bill No. 10, and that the title of the latter was never amended in the Senate or House. This idea is evolved from the fact that on the Journal of the Senate, Senate Bill No. 10 appears to have been styled as a bill "To confer upon the town of Brownsville authority to issue corporation bonds," and the Act, as published, is entitled "An Act to confer upon the town of Brownsville, in the county of Haywood, the authority to issue corporation bonds in aid of railroads, and for other purposes."

By reference to the Senate and House Journals, it will be seen that Senate Bill No. 10, before its commitment to the committee of conference, was

also entered under the titles, "To confer upon the town of Brownsville authority to issue corporation bonds in aid of railroads," and "To confer authority upon the town of Brownsville to issue bonds."

There was no such duty imposed on the General Assembly by the Constitution of 1834 as that of entering on the journals of both or either of the houses, *in ipsissimis verbis,* the title of every bill or Act they might adopt.

In *Field* v. *Clark,* 143 U. S., the Court said: "In regard to certain matters, the Constitution expressly requires that they shall be entered on the journal. * * * But it is clear that in respect to the particular mode in which or with what fullness shall be kept the proceedings of either house relating to matters not expressly required to be entered on the journals—whether bills, orders, resolutions, reports, and amendments shall be entered at large upon the journals, or only referred to and designated by their titles or by numbers— these and the like matters were left to the discretion of the respective houses of Congress." In the nature of things, legislative journals are frequently "constructed from loose memoranda, made in the pressure of business, and amid the distractions of a numerous assembly."

It would in many instances operate to defeat the will of the Legislature, as expressed in published approved statutes, if the passage of bills was made to depend on entire and exact agreement of the entries of the titles on the journals, with the

titles as contained in the drafts thereof as intro-
duced and subsequently signed by the Speakers.

The title of Senate Bill No. 10, as found on
the journals, may well be treated as an abbrevia-
tion of the title thereof as prefixed to the pub-
lished Act, or as a clerical omission of a part of
the title from the journal. Such a conclusion is
in harmony with the rule that every reasonable
presumption will be indulged to support the regu-
larity of the passage of laws, and is promotive of
the policy that legislative acts should, if possible,
be sustained.

*Second.*—Objection is also offered to the validity
of this Act of 1870, because Senate Bill No. 10
contained at least twenty-six sections, with the con-
tention that this appears from the journals of the
Senate and the House. On this averment the
appellees base the conclusion that these were dis-
tinct bills. Taking it for granted that Senate Bill
No. 10, as it went into the hands of the com-
mittee of conference, contained twenty-six sections,
does it necessarily follow that it was distinct from
what is now the Act of 1869–70, Ch. 55? True
it is that the latter has only twenty-two sections.
The history of Senate Bill No. 10 is that the
committee of conference drafted it. In doing so
they might, without substantially changing it, have
reduced it to twenty-two sections.

We have examined the House and Senate Jour-
nals of the Session of 1869–70, and have not been
able to find therein any entry or allusion to any

bill which relates to the subject-matter of that Act besides Senate Bill No. 10.

It can further be said that the mere recital on the journal of, or reference to, the twenty-sixth section does not countervail the evidence found on the face of the Act of the actual existence of only twenty-two sections. Under the rule which is here applicable, the more potent and persuasive evidence is that which will support the Act. So that if this fact of twenty-six sections were vital, it would be adjudged, for the purposes of this case, not to exist. To hold that Senate Bill No. 10 and the Act are not in fact one, would be to reverse the presumption which is indulged, for salutary ends, to save statutes from becoming inoperative.

*Third.*—The third proposition, on which it is contended that the Act of February 8, 1870, is void, is the fact that Senate Bill No. 10, before it went to the House, had in its first section the words "semi-annually," which was proposed to be amended in the House by inserting in lieu thereof "annually," and the words "six per cent.," for which in the House the words "eight per cent." were proposed to be substituted, and the Act, as presented, has no words of similar import, or of a kindred nature in its first section.

This comment is made to prove that the Act was a new bill. The fact that when the bill was redrafted by the committee of conference, the different sections may have been transposed, did not make it a new bill so as to require three

readings thereof, when it should be returned to the houses for further action, because it would be obviously immaterial that various parts thereof were moved, so to speak, from one to another place therein.

In this connection the Act is criticised on account of the failure of the committee of conference to insert in the bill the amendments proposed in the House by the words "annually" and "eight per cent.," and the insertion by them on the subject of interest "not exceeding the rate of interest at the place where said bonds are payable," without any reconsideration in either chamber by which Senate Bill No. 10 had been passed.

The committee of conference, evidently by mutual concession, and upon proper deliberation, adjusted the differences which they had been commissioned to settle.

There was no necessity, when the report was submitted to the Senate, for that body to reconsider their former action, any more than it would have been essential for them to do so if they had, in the first instance, concluded to acquiesce in the amendments proposed by the House. Senate Bill No. 10 had not been rejected in either house. It was first regularly passed in the Senate, then passed with amendments in the House, which amendments were non-concurred in, and then it was put into the hands of a committee of conference, who reported, and their report was approved by both houses. Upon an examination of

the journals of the two houses of the Legislature, it will be found to have been common practice to adopt bills upon the reports of committees of conference, appointed after amendments proposed by one of them and not approved by the other, by merely concurring in the report. Such has been the practice of our Legislatures, and it would be unwise now to adopt a rule which might nullify many statutes which have been received by the people as the law of the land, and have become canons of property. But, assuming it to have been necessary for the Senate to have reconsidered the bill after it was returned by the committee of conference, it can be said there is no evidence that this was not done. The journals show no reconsideration; they are silent on the subject. Such silence will be treated as a case of omission. *State* v. *Algood, supra.*

*Fourth.*—It is further contended that the Act of February 8, 1870, is void, because the Act was passed on that day, and Senate Bill No. 10 was not signed by the Speaker of the Senate or House until on or after February 18, 1870. To maintain this proposition, it is argued that it appears the bill was not enrolled in the Senate until February 21, 1870, at which date the House transmitted the bill to the Senate. For the support of this position, it is asserted that a bill is never signed by the Speaker until it is enrolled or engrossed.

The Senate Journal does recite that on February 18, 1870, the Committee on Enrolled Bills re-

39—7 P

ported that they had "examined Senate Bill No. 10, and found it correctly enrolled." This, however, does not necessarily prove the date of the enrollment of the bill. It may, notwithstanding the fact that the committee then made the report, have been enrolled prior to that date.

Furthermore, it may be true that a bill is not ordinarily signed until it has been enrolled, but we cannot conclude that it is never so signed, especially when to do so might be to presume against the validity of an act of assembly, instead of making all reasonable presumptions in its favor.

The date of the signing of a bill was not, under the Constitution of 1834, evidence of the day on which it was passed. Bills must necessarily be passed before being signed. In *Dyer* v. *The State*, Meigs, 237, it was held, in regard to a statute enacted under the Constitution of 1834, that it took effect, not when it was signed, but by relation to a previous date when it was passed. Besides all this, the Constitution of 1834 did not forbid the Speakers from signing bills before their enrollment. The same reasoning may be applied to the entry on the Senate Journal of February 21, 1870, concerning the message of the House returning Senate Bill No. 10, signed, with the further comment that the date of the message is not recited, nor is the date given when it was actually received in the Senate.

It is further argued, that, because the journals fail to show the fact, the Act could not have

passed February 8, 1870. The silence of the journals does not operate in this way. Their silence on the subject may have arisen from oversight or accidental omission.

*Fifth.*—The only remaining objection to this Act to be considered is that the committee of conference reported a new bill, which was passed without the three readings required by the Constitution. The idea that the bill as it came from the hands of the committee of conference was a new bill, separate and distinct from Senate Bill No. 10, is sought to be supported by the report of the committee. We do not think that, from the record, we are authorized to adjudge that the committee intended to report a new bill, or that they did so. The committee did say they deem it prudent to propose a bill in lieu. This language, standing alone, might ordinarily signify that the committee had devised a new bill. But the words are qualified by the statement that the accompanying bill "embraces substantially all the provisions of both houses."

The reasonable conclusion which may be deduced from the report, is, that the committee simply redrafted the bill; and they manifest this themselves by giving as their reason for having done so, the fact that the "original bill had been much disfigured by amendments, interlineations, and erasures."

Doubtless the two houses had access to the original of Senate Bill No. 10 when they considered the report of the committee, and it is not

to be presumed that they would have omitted to make proper comparison for their guidance in regard to the action to be taken thereon, so as to enable them to decide whether the committee had reported a new bill.

We will not presume that the Legislature were derelict in such an important particular. The Legislature is a co-ordinate department of the government with the judiciary, is invested with very high and responsible duties, and they act under the solemnity of an official oath which it is not to be supposed they will disregard. Cooley's Const. Lim., p. 217.

After a full consideration of the objections made to this Act of the General Assembly, we have reached the conclusion that such objections are not well taken.

The cause was tried below without a jury, and our duty is to render such judgment as ought to have been rendered in the Circuit Court.

The judgment is reversed. Let the peremptory writ of *mandamus* issue, as prayed for in the petition.

---

### DISSENTING OPINION.

TURNEY, Ch. J. The suit is to enforce the collection of bonds issued to Holly Springs and Ohio Railroad Company, under an Act claimed to have been passed in February, 1870. The bill

was introduced in the Senate on October 8, 1869, where it passed the three readings; went to the House, passed first reading; was amended, and passed second reading; again amended, and passed third reading. House amendments were referred to Committee on Internal Improvements, which recommended concurrence in the amendments of the House as to the twenty-sixth section, and non-concurrence as to the others:

Senate non-concurred except as to the twenty-sixth section. House refused to recede from its amendments. Senate adhered to its non-concurrence, and asked for a committee of conference. Both Houses appointed its members of said committee.

The conference committee reported to the Senate a "bill in lieu," and asked that it be adopted. The report is as follows: "Mr. Speaker—Your committee of conference, to whom was referred Senate Bill No. 10, with House amendments, beg leave to report the accompanying bill in lieu of said bill and amendments, in which is embraced substantially all the provisions of both houses. Your committee deem it prudent to propose a bill in lieu, as the original bill has been much disfigured by amendments, interlineations, and erasures. Your committee ask that the bill offered be accepted and passed. All of which is respectfully submitted."

The report was concurred in by the Senate on the fifth of February, 1870—the date of the report—and by the House on the seventh.

The Constitution is: "Bills may originate in either house, but may be amended, altered, or rejected by the other." Without repeating the history of the bill, we have seen that this bill did not originate in either house, but in the committee of conference from both houses, for which there is no constitutional authority, but, on the contrary, a direct prohibition, under the facts here. The word "may," as employed in the clause of the Constitution quoted, means "shall," and excludes all idea of the origination of a bill elsewhere than in the one or the other house; and a conference committee, composed of members from each house, is not contemplated in the term "either house."

The committee reported "a bill in lieu," and so define it as often as twice, and, I might say, three times in their short report. It was offered, as the title given it by the committee imports, in place of and as a substitute for the original bill and amendments.

However we look at the language of the report, it conveys no other idea than the offering of a new bill.

The language, "in which is embraced substantially all the provisions of both houses," is a conclusion which the committee had no authority to suggest. That was the province of the two houses.

The new bill did not pass the three readings in each house, but was simply concurred in by.

each house—by the Senate on the fifth and by the House on the seventh of February.

The provisions of the Constitution are intended to protect the people of the State against hasty and ignorant legislation, and ought to be strictly construed. All rules made by the Legislature governing its proceedings must conform to the Constitution, of which it is a creature.

Rules not in strict conformity to the Constitution are not valid, and all laws passed under them are void.

In this matter we are construing our Constitution, and authorities from other States are of little value except for their reasoning; and in weighing reasons we must have an eye to the public policy that may induce it. The parliamentary rules of Congress can be of little service, as there is no such provision in the Constitution of the United States.

Whatever may be the holdings of other States with similar constitutional provisions, we must interpret our language for ourselves, and assume that the framers of the Constitution meant what they said, and used the words of that instrument in the sense of their common acceptation and meaning. There being no law authorizing their issuance, the bonds are nullities, and no obligation rests on the county for their payment.

For these reasons I do not concur with the majority.

Nelson *v.* Haywood County.

CALDWELL, J.   I think it affirmatively appears from the journal that the bill reported by the conference committee was a new bill, and that, as such, it did not pass three readings; and, hence, that the Act was not constitutionally passed, and is void.