## BYRD WILSON *v.* THE STATE.

## (*Nashville,* December Term, 1919.)

1. **STATUTES. It is enough to comply with Constitution that subject-matter of act is germane to title.**
   The object and purpose of Constitution article 2, section 17, in providing an act shall embrace but one subject, which shall be expressed in the title, is to give notice to the legislator of the subject of the legislation, and it is enough that the subject-matter of the act be germane to that expressed in the title, whether the body enlarges or restricts the title. (*Post, pp.* 55-63.)

Acts cited and construed: Acts 1919, ch. 657.

Case cited and approved: Garvin v. State, 81 Tenn., 162.

Constitution cited and construed: Art. 2, sec. 17.

2. **STATUTES.  Act embracing more than one subject invalid.**
   The requirement of Constitution article 2, section 17, that a statute shall not embrace more than one subject, which shall be expressed in the title, is mandatory, and a statute contravening the provision is invalid. (*Post, p.* 64.)

Cases cited and approved: State v. Yardley, 95 Tenn., 546; Saunders v. Savage, 108 Tenn., 340; State v. Schlitz Brewing Co., 104 Tenn., 715;   Cannon v. Mathes, 55 Tenn., 504; Cole Mfg. Co. v. Falls 90 Tenn., 466. ,

3. **STATUTES.  Title need not epitomize provisions of body of act.**
   It is not essential to the validity of a statute, under Constitution, article 2, section 17, that its title epitomize or recite in detail the provisions contained in its body. (*Post, pp.* 64, 65.)

Cases cited and approved: Memphis R. Co. v. State, 110 Tenn., 598; State v. Brown, 103 Tenn., 449.

Wilson v. State.

4. **STATUTES.** Act imposing vehicle tax not unconstitutional, as embracing more than one subject, or one not germane to title.

Priv. Acts 1919, chapter 657, imposing a tax on vehicles in certain counties to raise road funds, is not violative of Constitution article 2, section 17, an embracing more than one subject, or one not germane to the subject expressed in the title. (*Post, pp.* 65-67.)

5. **CONSTITUTIONAL LAW.** Constitutional construction favored.

A statute, if possible, should be construed as not violating the Constitution, rather than as viollating it. (*Post, pp.* 65-67.)

Constitution cited and construed: Art. 2, sec. 18.

6. **STATUTES.** Requirements of Constitution met by houses in passage of act.

Every requirement of Constitution article 2, section 18, in the passage by Senate and House of Private Acts 1919, chapter 657, imposing a vehicle tax in certain counties to raise road funds, *held* Complied with. (*Post, pp.* 67, 68.)

7. **STATUTES.** Acts signed by speakers, and fact noted on journals, presumed regularly passed.

'When an act is signed by the respective speakers of the two house of the Legislature in open session, and the fact is noted on the journals, and the act approved by the Governor and published, every reasonable presumption and inference will be indulged in favor of its regular passage, and it will be presumed to have been regularly passed, unless the journals furnish affirmative contrary proof. (*Post, pp.* 68-71.)

Cases cited and approved: State ex rel v., Algood, 87 Tenn., 163; Nelson v. Haywood County, 91 Tenn., 602; Williams v. State, 74 Tenn., 549.

Case cited and distinguished: State v. McConnell, 71 Tenn., 332.

8. **LICENSES.** Vehicle tax not double taxation.

Priv. Acts 1919, chapter 657, imposing a vehicle tax in certain counties to raise road funds, *held* not unconstitutional, as effecting double taxation. (*Post, pp.* 71, 72.)

Wilson v. State.

9. **LICENSES.** Vehicle tax not double taxation on motor vehicles.

Priv. Acts 1919, chapter 657, imposing a vehicle tax in certain counties to raise road funds, *held* not violative of the Constitution, as imposing double taxation on vehicles driven by motor power, in view of Pub. Acts 1917, chapter 73. (*Post, p. 72.*)

Acts cited and construed: Priv. Acts 1919, ch. 657; Pub. Acts 1917, ch. 73.

10. **TAXATION.** Legislature may tax privileges as it will.

The Legislature has unlimited and unrestricted power to tax privileges, which power may be exercised in any manner or mode in its discretion. (*Post, p. 72.*)

Cases cited and approved: Jenkins v. Ewin, 53 Tenn., 473; Friedman v. Mathes, 55 Tenn., 489; Kelly v. Dwyer, 75 Tenn., 190; Shelton v. Silverfield, 104 Tenn., 71; Steel & Wire Co. v. Speed, 110 Tenn., 457; Trentham v. Moore, 111 Tenn., 352.

11. **LICENSES.** Vehicle tax act not unreasonable, because making operation without payment of tax a misdemeanor.

Priv. Acts 1919, chapter 657, imposing vehicle tax in certain counties to raise road funds, simply levying on privilege of operating vehicles on roads, *held* not arbitrary, oppressive, and unreasonable, because making it a misdemeanor for any person to operate his vehicle without first paying tax, though the county court clerk is empowered to collect the tax by distress warrant. (*Post. p. 72.*) •

FROM LINCOLN.

Appeal from the Circuit Court of Lincoln County.— HON. R. W. SMARTT, Judge.

ROUTT & MYERS, for appellant.

W. H. SWIGGART, JR., Assistant Attorney-General, and GILES L. EVANS, for the State.

MR. JUSTICE HALL delivered the opinion of the Court.

The question involved in this case is the constitutionality of chapter 657 of the Private Acts of 1919, the title of which is as follows:

"An act entitled an act to provide revenue by assessing a privilege tax in counties of this State having a population of not less than 25,907 nor more than 25,909 under the federal census of 1910, or any subsequent federal census, on carts, buggies, surreys, wagons, traction engines, automobiles and motorcycles, to further promote and provide for the building and maintaining of the public roads of said counties, and to provide the methods of collecting such tax and manner of designating or marking vehicles on which such tax has been paid."

Section 1 of said act reads as follows:

"Be it enacted by the General Assembly of the State of Tennessee, that a privilege tax is hereby levied and shall be collected by the county court clerks in counties of this State having a population of from 25,907 to 25,909 inhabitants by the federal census of 1910 or any subsequent federal census, on all carts, buggies, surreys, wagons, traction engines, automobiles and motorcycles, used upon the public highways of such counties, as follows: On each cart, buggy and surrey, $2.50 per annum; on each one-horse wagon, $3 per annum; on each two-horse wagon, or wagon drawn by more than two horses, and on each traction engine, $5 per annum; on each automobile, including automobile trucks, and motorcycles, the sum of ten cents per annum on each horsepower of the motive power

of such vehicle.  Said taxes shall be paid to the county court clerks of said counties for the year 1919 by the owner or the operator of such vehicles herein taxed, for which tax, both are liable personally, provided, such vehicle is used upon the public highways of any county within the provisions of this act, on or before the first Monday in July, 1919, and annually thereafter, as other privilege taxes are paid.

"When so paid the county court clerk to whom paid shall give his receipt therefor and shall register said vehicle on which the same is paid, for which registration he shall receive a fee of twenty-five cents to be paid by the owner or person paying tax on the vehicle and he shall furnish to such owner or person paying said tax a tag, of tin or other metal, for such vehicle with a number stamped or imprinted thereon, showing the year and the name of the county, a record of which number shall be kept in the clerk's office in said registration records, which tag must be attached to the rear axle or the rear of the body of said vehicle, where it shall so remain until another tag is procured for the next succeeding year.

"In the event any such tag is lost by the taxpayer or owner of the vehicle, such owner shall pay for the registration and cost of another tag.

"The tags herein provided to be furnished to the taxpayers shall be purchased by the respective county court clerks from the funds in their hands arising from the taxes herein provided for, the cost of the same not to exceed ———————— cents each."

Section 2 reads as follows:

"Be it further enacted, that all owners or operators of any of the vehicles hereinbefore enumerated shall pay the taxes herein provided for in advance and before using any of the vehicles hereinbefore enumerated or operating them upon the public roads of the said counties, or any of them, paying a proportionate amount of the tax for the remainder of the year on any such vehicle or vehicles purchased or first used or operated upon any of said public roads after the first Monday in July, 1919, and at any time after January 1, of any ensuing year."

Section 3 reads:

"Be it further enacted, that it shall be a misdemeanor for any person or persons to violate any of the provisions of this act or to use or operate any of said vehicles upon any of said public roads before first having paid said tax thereon or without having attached thereto said tag, and upon conviction thereof such person or persons shall pay a fine of not less that $5 nor more that $50 and the costs of the prosecution, and the grand juries of the respective counties coming within the provisions of this act shall have inquisitorial powers as to such offenses.

"All sheriffs, deputy sheriffs and constables of said respective counties are hereby given general police powers for the enforcement of the provisions of this act, and it shall also be the duty of the civil district road commissions of said respective counties to report to proper officials for prosecution any violation of this act coming to their knowledge."

Section 4 vests power in the clerks of the county courts of the counties falling within the provisions of said act, and makes it their duty to issue distress warrants for the collection of the tax provided for in the first section of the act.

Section 5 reads:

"Be it further enacted, that the clerks of the county courts of the counties coming within the provision of this act shall pay over to the county trustee, at the end of each month, the taxes so collected, or in his regular settlements with such trustee, taking the trustee's receipt therefor, and such fund shall become and be a part of the funds in the hands of said trustee, to be used in the improvement, building and maintaining of the public roads of said county, as other taxes levied and appropriated for such purposes are expended.

"In the collection of the taxes herein provided for and in their settlements for the same with the said trustees, said county court clerks shall keep an accurate and correct system of accounts, which shall also accurately show and keep separate account of the amounts of such taxes collected from taxpayers residing in the respective civil districts of their counties, and said trustees shall also keep a correct and accurate system of said accounts by civil districts, as required of said clerks, and such funds shall be expended for the purposes hereinbefore provided in the respective civil districts proportionate to the respective amounts paid by the taxpayers residing in such districts: Provided, at the discretion of the respective civil district

board commissioners of said counties, any part or portion of the fund to be so expended in their respective districts may be expended in the building, maintaining and improving of any public road in such district which may be a part of any designated system of public highways of such county."

By section 6 it is provided that said act shall not apply to transient vehicles passing through the county, nor be so construed or applied as to require the purchaser of any such vehicle, during any taxable year, to pay an additional tax thereon where the tax provided for has already been paid in the same county for that year by a previous owner.

By section 7 it is provided that, should any of the provisions of said act for any reason be unconstitutional, void, or otherwise inoperative, the same shall not operate to vitiate or render ineffective any of the other portions of the act, which are in themselves valid.

The appellant, Byrd Wilson, was indicted in the circuit court of Lincoln county, charged with "failure to pay his buggy tax" in accordance with the provisions of the foregoing act; that county falling within its provisions.

The case was called for trial at the special August term, 1919, of said court, when appellant moved the court, in writing, to quash the indictment upon the ground that the act under which appellant was indicted (chapter 657, Private Acts of 1919) was unconstitutional and void upon the following grounds:

(1)   That the act embraces more than one subject.

(2)   That said act was not passed in accordance with the provisions of the Constitution of the State.

(3)   That said act was not read and passed on three different days in each house of the General Assembly, and did not receive on its final passage of each house the assent of the majority of all the members thereof.

(4)   That said act, in effect, imposes double taxation on vehicles driven by motor power.

(5)   That said act is arbitrary and unreasonable.

The motion to quash was overruled by the trial judge and the appellant excepted.  Thereupon the appellant pleaded guilty to the charge contained in the indictment, and was fined $5, and adjudged to pay the costs of the prosecution.  From this judgment he has appealed to this court, and has assigned errors.

By the first assignment of error it is insisted that the act under which appellant was indicted embraces more than one subject, and therefore contravenes section 17 of article 2 of the state Constitution, which requires that— "No bill shall become a law which embraces more than one subject, that subject to be expressed in the title."

It is insisted that the act in question embraces two distinct subjects of legislation— one, the raising of revenue; the other, the building and maintaining of public roads in the counties to which said act applies; that this last subject is contained in section 5 of said act, and is not germane to the subject expressed in the title, which is that of raising revenue; and that, therefore, said act is unconstitutional and void.

The object and purpose of the Constitution, in providing that an act shall embrace but one subject, which shall be expressed in the title, is to give notice to the legislator of the subject of the legislation, and it is sufficient so long as the subject-matter of the act is germane to that expressed in the title, whether the body enlarges or restricts the title. Garvin v. State, 13 Lea, 162.

The constitutional requirement that a statute shall not embrace more than one subject, which shall be expressed in the title, is mandatory; and a statute framed in contravention of this provision of the Constitution is invalid. State v. Yardley, 95 Tenn., 546, 32 S. W., 481, 34 L. R. A., 656; Saunders v. Savage, 108 Tenn., 340, 67 S. W., 471; State v. Schlitz Brewing Co., 104 Tenn., 715, 59 S. W., 1033, 78 Am. St. Rep., 941; Cannon v. Mathes, 8 Heisk., 504; Cole Mfg. Co. v. Falls, 90 Tenn., 466, 16 S. W., 1045.

It is not essential to the constitutionality of a statute that its title epitomize or recite in detail the provisions contained in its body. State v. Schlitz Brewing Co., supra; State v. Yardley, supra; Memphis R. Co. v. State, 110 Tenn., 598, 75 S. W., 730; State v. Brown, 103 Tenn., 449, 53 S. W., 727.

The general purpose of the provisions of section 17 of article 2 of the Constitution is accomplished when the law has but one general purpose, which is fairly indicated by its title. It will not be required that every end and means necessary or convenient for the accomplishment of this general object be provided for by a separate act relating to that alone. Such a requirement would not only be un-

reasonable, but would render legislation impossible. *Cannon* v. *Mathes, supra.*

It therefore may be stated that the true rule of construction, which has been fully established by the authorities, is that any provision of the act, directly or indirectly relating to the subject expressed in the title, and having a natural connection thereto, and not foreign thereto, should be held to be embraced in it.

We think the act in question embraces but one subject, and that subject may be fairly stated to be the raising of revenue for the purpose of improving, building, and providing a fund for maintaining of public roads in the counties affected by the act.   We think it may be said that all of the provisions of the act are directly and inseparably connected with the one purpose of raising revenue for the improvement, building, and maintaining of public roads. We think the word "to," appearing before the words "further promote and provide," may be given the construction of "for the purpose of."   We think both the title and body of the act are susceptible of this construction.   The act being susceptible of this construction, which construction renders the act not obnoxious to the constitutional provision hereinbefore referred to, it should be so construed rather than as violating the Constitution.   This is the established rule of construction.   *State* v. *Schlitz Brewing Co., supra.*

It is next insisted that the act was not constitutionally passed by the Legislature.

143 Tenn.—5

The act was Senate Bill No. 1158, and it appears from the record and stipulation of counsel that Senate Bill No. 1158 and House Bill No. 1221 were upon the same subject; the one being a *verbatim* copy of the other. House Bill No. 1221 was introduced in the House on April 1, 1919, and passed first reading. On the same day House Bill No. 1220, a private act applicable to counties having the same population and being an amendment of the general road law of such counties, was introduced in the House and passed first reading. Both of these House Bills passed second reading in the House on April 10th, and were held without reference. The journal entry pertaining to bill No. 1221 follows immediately the entry pertaining to bill No. 1220 on each date. Prior to April 14th Senate Bill No. 1158 had passed three readings in the Senate, and was on that date transmitted, as passed, to the House for consideration. On the clerk of the House announcing the receiving of the bill and message from the Senate, the following entry was made on the House Journal:

"On motion, Senate Bill No. 1158, *on the same subject,* was substituted for House Bill 1220. Thereupon Senate Bill No. 1158 passed its third and final reading. A motion to reconsider was tabled." (Italics are ours.)

Senate Bill No. 1158 was then retransmitted to the Senate, signed by its speaker in open session, sent back to the House so signed, and was signed by its speaker in open session; the fact of the signing by both speakers being noted on the respective journals. In due time the bill was approved and signed by the Governor.

It is insisted that, because the entry on the journal
shows that Senate Bill No. 1158 was substituted for
House Bill No. 1220, which was a bill upon an entirely
different subject, Senate Bill No. 1158 was never passed
on three readings of the House, as required by section 18
of article 2 of the State Constitution, which provides
that—

"Every bill shall be read once, on three different days,
and be passed each time in the house where it originated,
before transmission to the other.   No bill shall become
a law until it shall have been read and passed, on three
different days in each house, and shall have received, on
its final passage in each house, the assent of a majority of
all the members to which that house shall be entitled un-
der this Constitution, and shall have been signed by the
respective speakers in open session, the fact of such sign-
ing to be noted on the journal, and shall have received the
approval of the Governor, or shall have been otherwise
passed under the provisions of this Constitution."

The bill involved in the instant case was identical in
caption and body with House Bill No. 1221.  It was duly
and regularly read once on three different days and passed
each time in the Senate before being transmitted from that
body to the House.   It was duly and regularly read once,
on two different days, and passed each time in the House,
being referred to as House Bill No. 1221.  It was read and
passed another and third day in the House, being referred
to as Senate Bill No. 1158, before being transmitted from
the House back to the Senate.  It was read and passed on

three different days in the Senate, as Senate Bill No. 1158. It was thus read and passed on three different days in the House, twice as House Bill No. 1221, and the third time as Senate Bill No. 1158, substituted. It received on its final passage in the House the assent of the majority of the members of the House. It was signed by the respective speakers in open session, and the fact of such signing was noted on the respective journals. It was thereafter duly signed and approved by the Governor. We think, therefore, that every requirement of section 18 of article 2 of the Constitution was complied with.

When an act is signed by the respective speakers in open session, and this fact is noted on the journals, and the act is approved and published, every reasonable presumption and inference will be indulged in favor of the regularity of its passage, and it will be presumed to have been regularly passed, unless the journals furnish affirmative proof to the contrary. *State ex rel.* v. *Algood,* 87 Tenn., 163, 10 S. W., 310; *Nelson* v. *Haywood County,* 91 Tenn., 602, 20 S. W., 1.

In *Williams* v. *State,* 6 Lea, 549, the bill there involved was introduced in the House and designated as House Bill No. 50, to change the county lines between Giles and Marshall counties. It passed three readings on three days in the House, as shown by the journal, and was then transmitted to the Senate, where, as shown by the Senate Journal, it passed two readings on different days, and on February 14, 1879, was materially amended, and as amended passed its third reading by the constitutional majority.

Wilson v. State.

The House Journal showed that on the same day the clerk of the Senate returned to the House, among other bills:

"House Bill No. 58 to change the county line between Giles and Marshall counties, amended and passed by the Senate."

House Bill No. 58, proper, was not to change the lines between these two counties, but was on a wholly different subject. There was no other House Bill on this subject that had been amended and passed in the Senate. The House Journal showed that on the same day the bill designated House Bill No. 58 was taken up and the Senate amendment nonconcurred in. On the next day, on motion of the member from Marshall county, the vote rejecting the Senate amendment to House Bill No. 58 was reconsidered, and the amendment concurred in. The journal of the 17th showed that the committee on enrolled bills reported that certain other bills and resolutions, together with House Bill No. 50, had been compared and found correct, and presented for the signature of the speakers; the journals showed that the bill was signed by the Governor. This court, in passing upon the validity of the bill, said:

"From these facts, we are of opinion that the principal objections taken to the bill do not exist in fact; that the bill was passed, the amendment of the Senate concurred in by the House, the bill signed by both speakers in open session, and the fact noted upon the journals. Notwithstanding the confusion in the numbers, we think these facts do sufficiently appear."

In *State* v. *McConnell*, 3 Lea, 332, an act of the General Assembly was attacked as not having been constitutionally passed. The journal of the House showed that it had regularly passed three readings in that body. The Senate Journal showed that it had passed two readings in the Senate, one of these purporting to be the third; it being conceded in argument that the journal showed the passage of the bill on third reading in each house with all constitutional formalities. This court, in passing upon the validity of said act, said:

"Under these circumstances, the presumption in favor of the regularity of the passage of the act through all its stages is so strong that the mere failure of the journals of the Senate to show a second reading, if the fact be that way, would not affect its validity, but would be treated as a clerical omission."

The bill involved in the instant case having been signed in open session by the speakers of the respective houses, the fact noted on the respective journals, and the act approved by the Governor, every reasonable presumption and inference must be indulged in favor of the regularity of its passage. Senate Bill No. 1158, under which designation it passed final reading in both houses, and was signed by both speakers and approved by the Governor, was identical in caption and body with House Bill No. 1221, the only House Bill on the same subject. This House Bill passed two readings as House Bill No. 1221, and the entries pertaining thereto followed immediately the respective entries in the House Journal showing the passage on

the first and second reading of House Bill No. 1220 applicable to counties having the same population as those to which House Bill No. 1221 and Senate Bill No. 1158 were applicable. The entry on the House Journal shows that the House Bill, for which Senate Bill No. 1158 was intended to be substituted, was on the same subject as Senate Bill No. 1158.

We think, therefore, it may be fairly presumed that the House intended to and did substitute Bill No. 1158 for House Bill No. 1221 on the same subject, and that the journal entry showing that it was substituted for House Bill No. 1220 was a mere clerical error or confusion in numbers, due to the proximity of numbers 1220 and 1221, and the House Journal entries pertaining to the first and second readings of House Bills 1220 and 1221, and the identical provisions as to population in all three of the bills.

It is next insisted by appellant that the act imposes double taxation, and for that reason is unconstitutional and void.

We do not think this contention is well grounded. We think the act, properly construed, levies a privilege tax on the operation of the vehicles enumerated therein, on the public roads of the counties having a population within the limits prescribed.

It is next insisted that the act imposes double taxation on vehicles driven by motor power, in view of chapter 73 of the Public Acts of 1917, by the provisions of which a privilege tax, or taxes, is levied on the owners of motor

driven vehicles. It is insisted that the tax levied by the two acts amounts to double taxation, and for that reason the act involved in the instant case is invalid.

The Legislature has unlimited and unrestricted power to tax privileges, and this power may be exercised in any manner or mode in its discretion. *Jenkins* v. *Ewin,* 8 Heisk., 473; *Friedman* v. *Mathes,* 8 Heisk., 489; *Kelly* v. *Dwyer,* 7 Lea, 190; *Shelton* v. *Silverfield,* 104. Tenn., 71, 56 S. W., 1023; *Steel & Wire Co.* v. *Speed,* 110 Tenn., 547, 75 S. W., 1037, 100 Am. St. Rep., 814; *Trentham* v. *Moore,* 111 Tenn., 352, 76 S. W., 904.

It is next insisted that the act is arbitrary, oppressive, and unreasonable, and therefore invalid, because it arbitrarily levies a tax on vehicles; although the county court clerk is empowered to collect the tax by a distress warrant, the act provides in addition that it shall be a misdemeanor for any person to violate its provisions.

We do not think the act levies a tax directly on the property itself, but simply levies a privilege on the operation of vehicles on the public roads, and the fact that the act in addition makes it a misdemeanor for any person to operate his vehicle on the public roads without first paying the tax does not render the act arbitrary, oppressive, and unreasonable.

We find no error in the judgment of the court below, and it is affirmed, with costs.